**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**RONALD ANDERSON,**

      **Petitioner,**

      **v.**

**WARDEN, ALLEN
CORRECTIONAL INSTITUTION,**

      **Respondent.**

           **CASE NO. 2:12-CV-1168
           JUDGE PETER C. ECONOMUS
           Magistrate Judge Elizabeth P. Deavers**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the instant petition, Respondent's *Return of Writ,* Petitioner's *Traverse,* and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

**Facts and Procedural History**

The Ohio Fifth District Court of Appeals summarized the facts and procedural history of this case as follows:

> On January 31, 2011, the Morrow County Grand Jury indicted appellant on one count of having weapons while under disability in violation of R.C. 2923.13, a felony of the third degree, one count of domestic violence in violation of R.C. 2919.25, a misdemeanor of the first degree, and one count of assault in violation of R.C. 2903.13(A), a misdemeanor of the first degree. The basis for the weapons under disability charge was a prior 1990 murder conviction for which appellant served 18 years in prison. On February 2, 2011, appellant entered a plea of not guilty to the charges.
>
> Subsequently, a jury trial commenced on March 14, 2011. The following testimony was adduced at trial.

Tina Stolpa is appellant's younger half-sister. At the time of the trial, she was in the process of getting a divorce. In 2010, Kara Kassler, appellant's girlfriend, moved in with Stolpa and, approximately a month or so later, appellant also moved into Stolpa's house. Stolpa testified that she owned a gun that was kept in the garage in a case and that the bullets were kept in their own bag.

Stolpa testified that in December of 2010, appellant's truck was involved in an accident. At the time of the accident, Kassler was driving and Stolpa's oldest child was in the truck. According to Stolpa, there was tension between appellant and Kassler after the accident.

Stolpa testified that on New Year's Eve, appellant, Kassler, Stolpa's mother, Deborah Myer and Stolpa's children were all at Stolpa's house. She further testified that she was in and out of her garage with Kassler, Myer and appellant drinking beer, smoking and listening to music. While they were in the garage, Stolpa told Kassler that, by the same time next year, she would be divorced and would be able to go out with friends to a bar and shoot pool. According to Stolpa, after Kassler indicated that she could go with Stolpa, appellant said that he did not want Kassler going out to a bar and the two got into an argument. Stolpa then went back into the house. When appellant came into the house shortly thereafter, his tongue was bleeding. After appellant fell asleep on the couch, Kassler told Stolpa that she should wake appellant up because appellant wanted to shoot Stolpa's gun off at midnight. According to Stolpa, the gun was in appellant's pants underneath his shirt.

After appellant woke up, he put the gun back in the garage after Stolpa told him that she did not want an accident to happen and her neighbors did not like loud noises. Once Stolpa's children went to bed, all of the adults had a shot of alcohol and went out to the garage to smoke. After returning to the house, appellant and Kassler got into an argument over whether or not to pull out the sofa bed. According to Stolpa, Kassler was swearing and yelling at appellant and told him that she would not lay with him. Stolpa testified that, in response, appellant told Kassler that she was drunk and did not know what she was saying. They all then went to sleep.

At trial, Stolpa testified that the next day, New Year's Day, Kassler announced that she was going to walk into town, which was three miles away, to get some cigarettes and to clear her head. After Kassler returned, she sat on the couch opposite from appellant and the two hardly spoke to each other. According to Stolpa, at

approximately 8:00 p.m., Kassler, who had been smoking in the garage, came into the house and told appellant that they were through. Stolpa testified that appellant agreed and that after Kassler whispered something to appellant, appellant smacked Kassler in the face and the two began yelling at each other. After Kassler indicated that she was going to leave, appellant told her that she was not going anywhere and the two continued arguing loudly until Stolpa told them to leave. Appellant and Kassler then left Stolpa's house.

Stolpa testified that she was in the garage smoking with her mother when appellant came into the garage and went to get the gun, which was stored in a case in her husband's Firebird. When Stolpa told appellant that the gun was hers and that he could not take it, appellant threatened to knock her out. Appellant then took the gun out of the car into the house, sat down at the kitchen table and started putting the bullets in the clips. The following is an excerpt from Stolpa's testimony at trial:

"Q. Did he load one clip or both clips?

"A. He loaded both of them. So he sat down to put his boots on and he said, well, he stood up after he got done tying his boots, put his boots on. He stood up and stood by my front door. He turned around and looked at me and said, well—excuse me. He said, 'Well, the next time that you see Kara or me we are both going to be dead, because when I find her it is going to be over, because she is going to be dead. I'm going to kill her. I'm going to kill myself. So the next time you see us just make sure you bring a rose to her grave and you can piss on my grave for all I care because I'm done. I can't take this. I can't take it out here no more. This is—everything is just too much.' And she is just, 'I can't live without her and I'm not going to let her live without me.' And all this crazy stuff.

"And I'm—I'm still trying to talk him down at the same time. I'm like, 'dude, she is not worth it. Just let her go.' I'm like, 'You don't' have to do this.' And he told me—at the kitchen table I was trying to take the gun from him. I mean I put—I put one hand on, I put my one hand on his arm. I'm like, 'You don't need to do this. Just let me have my gun back.' He is like, 'At this point now, sis, if you get in my way I'm going to kill you, too.' I mean just the look, the look in his eyes there is—it is like he was not even him any more (sic). It was like my brother was gone. There was so much anger and hate and rage in there. I don't even know." Transcript at 250–251.

3

When Stolpa told appellant that the neighbors might see the gun and call the police, appellant told her that he would shoot them also. After appellant left, Stolpa locked the door and sat down on the couch with her mother.

Approximately fifteen or twenty minutes after appellant left, Stolpa and Myer heard a knock on the door and found Kassler outside shaking and crying. Kassler told Stolpa that appellant had passed her on the road and that she had heard and seen a gun. Stolpa then dialed 9–1–1.

Stolpa testified that before calling the police, she called Bruce Campbell after appellant left her house with the gun. She testified that she believed that Campbell, who was appellant's best friend, could talk some sense into appellant. Stolpa further testified that after appellant was in police custody, she found the gun and bullets in a sack on her front porch on January 2, 2011. She turned the gun over to the Sheriff's Department. Stolpa denied receiving a telephone call from Campbell, on January 2, 2011 or that she had called Campbell after appellant was taken into custody. She further testified that she did not talk to Campbell the day appellant was arrested, or the next day or the day after that about the gun. She testified that the only communication that she had with Campbell was the night on which the incident occurred.

During trial, Stolpa indicated that appellant knew where the gun was kept in the garage because appellant was friends with her husband and had seen him put away the gun. She testified that appellant had used the gun for target shooting.

On cross-examination, Stolpa testified that she owned a van that had been broken for over a year. She testified that it would cost between $300.00 and $400.00 to fix. When asked, Stolpa denied that she ever discussed selling the gun to Bruce Campbell or having him sell the same in order to raise money to fix the van. She testified that Campbell was an acquaintance of hers and that appellant had given her Campbell's telephone number in case something happened when she was driving down to Tennessee for Christmas. Stolpa also testified that Campbell came to her house after appellant was arrested to pick-up appellant's clothes.

Stolpa further testified that she did not visit Campbell's house on New Year's Eve with appellant and Kassler and that appellant and Kassler had gone to Campbell's house the day before New Year's Eve. Stolpa also denied that, after New Year's Day, she sent a text

message to Kassler saying that she would not let her brother go down for this. She testified that she spoke with Kassler and told her that she did not want to see appellant go down and that he needed help with rage, anger and self-control.

At trial, Bruce Campbell testified that shortly before New Year's, appellant and Kassler came down to see him. He testified that on January 1, 2011 in the evening, appellant called him and asked him to come pick him up because he had had a fight with his girlfriend. Campbell said no. Later at approximately midnight appellant showed up at Campbell's door after riding his bike to Campbell's house. Campbell testified that appellant was not carrying anything. Appellant spent the night at Campbell's house and was arrested there the next morning. Campbell testified that when he spoke with Stolpa after appellant's arrest, she asked him about the gun and Campbell indicated that there was no gun. However, when Campbell went out later, he noticed that appellant's bike was leaning up against Campbell's privacy fence just outside his garage door. Campbell testified that when he brought the bike into the garage, he observed the gun six inches under the door. There was a three or four inch gap between the door and the ground. The ammunition was next to the gun and there was a magazine in the gun. A second magazine was in a plastic bag with other ammunition. Campbell testified that he then unloaded the gun and called Stolpa who said that the gun was hers. He then returned the gun to Stolpa in a paper bag along with two empty magazines and a bag of bullets.

Campbell testified that on approximately February 7, 2011, he received an unsigned letter. He testified that he recognized the handwriting on the letter and that it was appellant's handwriting. Stolpa also indentified the handwriting as appellant's. According to Campbell, the letter, which was admitted as Exhibit 14 at trial, asked Campbell not to say anything that was going to damage appellant's case.FN1 Campbell further testified that he received a phone call from appellant after he was arrested. The call was recorded and was marked as Exhibit 16 and was played for the jury. During the conversation, appellant made several comments about selling the gun or that Stolpa had sold the gun. Campbell denied knowing anything about that. Appellant also asked Campbell not to turn on him.

FN1. Appellant, in such letter, indicated that things were not going "to [sic] good for me at the moment but depending on you things could get a lot better for me."

On cross-examination, Campbell denied that Stolpa called him at 10:00 or 11:00 on New Year's Day and asked him to come get appellant and to talk him out of whatever he was going to do. He further testified that his garage/barn was locked the night of January 1, 2011, because he was security conscious due to incidents of vandalism. Campbell testified that he had video cameras outside his house, but that they were not running on the night in question. Campbell also testified that he collected guns, that he had approximately 45 guns, and that he occasionally participated in the sale or trading of guns. He testified that appellant did not have a gun on him when appellant showed up at his door. The following testimony was adduced when he was questioned about the telephone conversation:

"Q. You heard the phone conversation. When you said I ain't going down, were those your words, sir?

"A. Yes, they were.

"Q. What did you mean by that, sir?

"A. Well, I figured since I didn't call the police when I found the gun and I took it to Tina's house, that I put myself in some sort of jeopardy.

"Q. When Mr. Anderson asked you, there was a question in there where he said something about Tina selling the gun. You answered, no, I don't believe she sold it. What did you mean by that, sir?

"A. Well, when I called her after they arrested him, she said, 'Where is my gun?' So if she had sold it—" Transcript at 424.

On cross-examination, Campbell testified that Stolpa, appellant and Kassler all came to his house on New Year's Eve and that he gave a partial bottle of Wild Turkey to appellant to celebrate the new year. He denied that Stolpa asked him to sell the gun so that she could raise money to fix her van. He testified that when the officers who arrested appellant asked him where the gun was, he indicated that there was no gun.

On redirect, Campbell testified that appellant and Kassler had spent the night at his house not very long before the incident in this case. He was unable to recall the specific date. Campbell also testified that he did not call the police once he found the gun because he suspected that it was placed where it was by appellant.

Kassler was declared to be a court's witness and was cross-examined by both parties. She testified that she was residing in Cleveland with appellant's mother and stepfather as of the time of trial. Kassler testified that she had known appellant since she was 14 and that they had a daughter together. She testified that she moved in with Stolpa, Stolpa's husband and their three children in November of 2010.

According to Kassler, on December 30, 2010, Stolpa dropped appellant and Kassler off at Bruce Campbell's house, but did not spend the night there with them. She testified that they went back to Stolpa's the next day and that when Stolpa talked about going to a bar and playing pool with Kassler, appellant was not happy. Kassler testified that she accidentally bit appellant's tongue while they were kissing, causing it to bleed. At trial, Kassler further testified that she and appellant had a fight and that there was tension between them. According to Kassler, at approximately 8:00 p.m. on December 31, 2010, appellant said that he was done with her and hit her on the side of her face with his hand. She then told appellant that she was going to leave. The following is an excerpt from her testimony at trial:

"Q. And what was the defendant's response to that?

"A. I don't think he really cared. He was kind of, you know, he was upset.

"Q. Do you recall the defendant saying anything to you about you weren't going anywhere until you go to Court for wrecking his truck?

"A. We were arguing and he made the statement he was afraid I wasn't going to go to Court, that I was going to take off, which I wouldn't do that.

"Q. Do you recall arguing about the truck? Did the defendant ever say to you, that about this business about Court and that you would be lucky if the defendant didn't kill you before then?

"A. Could you please repeat that question, sorry?

"Q. The defendant said, you are not going anywhere until after you go to Court for wrecking this truck and that you would be lucky if the defendant didn't kill you before then. Do you remember saying anything to that effect?

7

"A. I think I wrote that out in my statement.

"Q. Is that in your statement?

"A. I'm pretty certain.

"A. So that's what you wrote out in your statement; is that correct?

"A. I'm pretty certain that is." Transcript at 473.

Kassler testified that she did not recall appellant threatening to kill her if she left, although such statement was in her written statement to police. She testified that she was pretty upset when she wrote out her statement to police.

Although, in her written statement to police, Kassler had indicated that Stolpa would not drop her off anywhere because she was afraid, Kassler testified that such statement was inaccurate and indicated that Stolpa could not take her anywhere because the car belonged to Deborah Myers and Myers told Stolpa that she could not use the car. When questioned whether she recalled telling Stolpa's mother that appellant was going to kill her if she did not get out, Kassler testified that while she wrote such statement in her written statement, she exaggerated because she was upset.

Kassler, in her written statement to police, stated that appellant threw her on the ground, grabbed her by the hair and told her to get the "FF in the house." Transcript at 481. She also stated that when they went back into the house, appellant hit her again. However, at trial, she testified that appellant did not hit her again, but rather that appellant had raised his hands to protect himself because she was angry.

Testimony was adduced that after Stolpa told appellant and Kassler to leave, Kassler went about three houses away and hid in the trees behind a house for approximately 15 minutes. In her statement to police, she stated that after she started walking toward the road, she heard appellant talking on his phone and heard a clicking sound which she thought was a gun. She testified that she never saw a gun, but that after going back to Stolpa's house and hearing what had happened, she thought that the clicking sound must have come from a gun.

Kassler admitted that, in her written statement to police, she stated that she wanted Stolpa to call the police so that appellant would not

come back and kill her. She also admitted writing that appellant was very dangerous and had threatened to kill her the whole evening.

According to Kassler, she witnessed Bruce Campbell come to Stolpa's house on January 2, 2011 and hand the gun over to Stolpa. She further testified that after moving out of Stolpa's house on February 3rd or 4th of 2011, she received a text message from Stolpa.

Deborah Myers, Stolpa's mother, testified that appellant was her stepson at one time. She testified that she came to visit her daughter in December of 2010. According to Myers, Stolpa took appellant and Kassler to Bruce Campbell's on December 30, 2010 and dropped them off there. After the two returned on New Year's Eve, all four adults had shots of Wild Turkey and were going in and out of Stolpa's garage smoking. When asked if, at some point in time on the evening of December 31, 2010, she saw a gun, Myers testified that she saw a gun down appellant's pants while appellant was sitting on the sofa. Appellant appeared to be asleep. After Stolpa woke appellant up, he went into the garage for approximately twenty minutes to half an hour.

Myers testified that, on January 1, 2011, appellant and Kassler were not talking to one another, but that later in the evening, she heard their voices raised. She testified that her 13 year old granddaughter told her that she had seen appellant hit Kassler. Later, when Myers was out in the garage with Stolpa, appellant came into the garage and took a black bag out of a Trans Am parked in the garage. Myers testified that appellant then went into the house and that she observed him loading a gun at the kitchen table. According to Myers, appellant said that he was going to find Kassler and shoot her and then himself. She testified that he also said that he was not going to go back to prison.

At the conclusion of the evidence and the end of deliberations, the jury, on March 17, 2011, found appellant not guilty of domestic violence, but guilty of having a weapon while under disability. The charge of assault had been dismissed upon appellee's motion due to lack of evidence. Pursuant to a Judgment Entry filed on May 5, 2011, appellant was sentenced to five years in prison.

Appellant now raises the following assignments of error on appeal:

"I. APPELLANT WAS DEPRIVED OF HIS CONFRONTATION RIGHTS UNDER THE SIXTH AMENDMENT (AS APPLIED

THROUGH THE FOURTEENTH AMENDMENT) AND
SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION
WHEN THE TRIAL COURT REFUSED TO ALLOW
APPELLANT TO PRESENT A DEFENSE SHOWING THAT
THE PROSECUTION'S PRIMARY WITNESS WAS BIASED,
PREJUDICED, AND HAD A MOTIVE TO LIE.

"II.   APPELLANT   WAS   DEPRIVED   OF   HIS
CONFRONTATION   RIGHTS   UNDER   THE   SIXTH
AMENDMENT (AS APPLIED THROUGH THE FOURTEENTH
AMENDMENT) AND SECTION 10, ARTICLE I OF THE OHIO
CONSTITUTION WHEN THE TRIAL COURT REFUSED TO
ALLOW   APPELLANT   TO   PRESENT   EVIDENCE   OF
INCONSISTENT STATEMENTS BY THE PROSECUTION'S
MAIN WITNESSES IN REGARD TO A MATERIAL ISSUE
GOING TO BIAS.

"III. APPELLANT WAS DEPRIVED OF HIS STATE AND
FEDERAL DUE PROCESS RIGHT TO A FAIR TRIAL WHEN
THE PROSECUTION WAS ABLE TO ELICIT PREJUDICIAL
INFORMATION ABOUT APPELLANT'S PRIOR MURDER
CONVICTION IN VIOLATION OF EVID.R. 403(B).

"IV. APPELLANT WAS DENIED HIS STATE AND FEDERAL
CONSTITUTIONAL   RIGHT   TO   THE   EFFECTIVE
ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO
PROPERLY OBJECT TO INADMISSIBLE EVIDENCE.

"V. APPELLANT WAS DENIED HIS STATE AND FEDERAL
CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR
TRIAL   BY   THE   CUMULATIVE   EFFECT   OF   THESE
ERRORS."

*State v. Anderson,* No. 2011 CA0006, 2012 WL 116172, at *1-7 (Ohio App. 5th ist. March 29,

2012).  On March 29, 2012, the appellate court affirmed the judgment of the trial court. *Id.*  On

September 5, 2012, the Ohio Supreme Court dismissed Petitioner's subsequent appeal. *State v.*

*Anderson,* 132 Ohio St.3d 1514 (2012).

Petitioner filed an application to reopen his appeal pursuant to Ohio Appellate Rule

26(B).  The appellate court, however, denied the application as untimely, and Petitioner never

filed an appeal to the Ohio Supreme Court. *Exhibits 10-11 to Return of Writ.*

Petitioner thereafter filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He alleges that he is in the custody of the Respondent in violation of the Constitution of the United States because he was convicted in violation of the Confrontation Clause (claims one and two); the prosecution elicited prejudicial information about Petitioner's prior murder conviction (claim three); he was denied effective assistance of counsel (claim four); and cumulative error (claim five).

Petitioner has withdrawn claims three and four from review. *See Traverse*, Doc. No. 13, PageID# 1051. It is the position of the Respondent that Petitioner's remaining claims are without merit.

**Standard of Review**

Petitioner seeks habeas relief under 28 U.S.C. § 2254. The Antiterrorism and Effective Death Penalty Act ("AEDPA") sets forth standards governing this Court's review of state-court determinations. The United State Supreme Court recently described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, —— U.S. ——, ——, 134 S.Ct. 10, 16 (2013) (quoting *Harrington v. Richter*, ——U.S. ——, ——, 131 S.Ct. 770, 786 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773, 130 S.Ct. 1855 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." (internal quotation marks, citations, and footnote omitted)).

The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e)(1) provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

"Under AEDPA, a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)); 28 U.S.C. § 2254(d)(1) (a petitioner must show that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law"); 28 U.S.C. § 2254(d)(2) (a petitioner must show that the state court relied on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding"). The United States Court of Appeals for the Sixth Circuit recently explained these standards as follows:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Coley*, 706 F.3d at 748–49. The burden of satisfying the standards set forth in § 2254 rests with the petitioner. *Cullen v. Pinholster*, ——U.S. ——, ——, 131 S.Ct. 1388, 1398 (2011).

"In order for a federal court to find a state court's application of [Supreme Court precedent] unreasonable, . . . [t]he state court's application must have been objectively unreasonable," not merely "incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003) (internal quotation marks omitted) (citing *Williams v. Taylor,* 529. U.S. at 409 and *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)); *see also Harrington v. Richter,* 131 S.Ct. at 786 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as "'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In considering a claim of "unreasonable application" under § 2254(d)(1), courts must focus on the reasonableness of the result, not on the reasonableness of the state court's analysis. *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) ("'[O]ur focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not whether the state court considered and discussed every angle of the evidence.' " (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir.2002) (*en banc*))); *see also Nicely v. Mills*, 521 F. App'x 398, 403 (6th Cir.2013) (considering evidence in the state court record that was "not expressly considered by the state court in its opinion" to evaluate the reasonableness of state court's decision). Relatedly, in evaluating the reasonableness of a state court's ultimate legal conclusion under § 2254(d)(1), a court must review the state court's decision based solely on the record that was before it at the time it rendered its decision. *Pinholster*, 131 S.Ct. at 1398. Put simply, "review under § 2254(d)(1) focuses on what a state court knew and did." *Id.* at 1399.

**Merits - Claims One and Two**

In claim one Petitioner asserts he was convicted in violation of the Confrontation Clause because the trial court refused to permit him to elicit testimony that Tina Stopla had a motive to lie, as he planned to testify against her at her divorce proceedings. *Petition*, PageID# 5. In claim two, Petitioner asserts that he was denied his right to confront witnesses against him because the trial court refused to permit him to elicit testimony from Kara Kassler that she overheard Stolpa and Bruce Campbell discuss selling the gun. PageID# 6. The state appellate court rejected these claims as follows:

> Appellant, in his first assignment of error, argues that he was deprived of his confrontation rights under the Sixth Amendment and Section 10, Article 1 of the Ohio Constitution when he was not permitted to show that Tina Stolpa, his half-sister, was biased against him and had a motive to lie.
>
> Trial courts are granted broad discretion with respect to the admission or exclusion of evidence at trial. *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343, 348, (1987). Thus, an appellate court will not reverse a trial court's ruling absent an abuse of discretion. *State v. Myers*, 97 Ohio St.3d 335, 348, 2002–Ohio–6658, 780 N.E.2d 186, ¶ 75. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140, (1983). Absent an abuse of discretion resulting in material prejudice to the defendant, a reviewing court should be reluctant to interfere with a trial court's decision in this regard. *State v. Hymore,* 9 Ohio St.2d 122, 224 N.E.2d 126, (1967).
>
> Cross-examination is the primary means by which the credibility of a witness is tested. *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347, (1974). Exposing a witness' motivation in testifying is a proper and important function of the right of cross-examination. *Greene v. McElroy*, 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959).
>
> Evid. R. 403(A) provides as follows:

"[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

In the case sub judice, appellant sought to cross-examine Tina Stolpa to show that she was biased against him because he was planning to testify at her divorce proceedings that she had falsely accused her husband of domestic violence against their daughter. Appellant sought to introduce such evidence to show that Stolpa was biased against him and had a motivation to lie about appellant being in possession of the gun. The trial court refused to let appellant cross-examine Stolpa about the divorce proceedings finding that the same was not relevant.

At trial, appellant proffered Stolpa's testimony. We note that Stolpa, during voir dire outside the presence of the jury, testified that she was unaware that appellant had been subpoenaed to testify against her in court in the domestic matter. Thus, appellant failed to show that Stolpa was biased and was trying to get back at appellant by testifying against him. We also concur with appellee that whether or not domestic violence occurred within Stolpa's home was not relevant to the issues in this case. Finally, we find that, assuming, arguendo, that the trial court erred in not admitting the proffered evidence, such error was harmless based on the evidence. Stolpa, Bruce Campbell and Deborah Myers all connected appellant to the gun. Moreover, Kassler, in her written statement to police, stated that she heard clicking sounds and knew that appellant had a gun. As is stated above, Campbell testified that on approximately February 7, 2011, he received an unsigned letter with appellant's handwriting. The letter, which was marked as an Exhibit, asked Campbell not to say anything that was going to damage appellant's case. Finally, during trial, a recorded telephone call from the jail from appellant to Campbell was admitted. During the call, appellant asked Campbell about the gun and sighed when told that Campbell had returned the same to Stolpa. Appellant, during the call, told Campbell not to let them talk him into testifying and asked Campbell not to put the gun in appellant's hands. Appellate also asked Campbell not to turn on him and Campbell replied that he would do what he could, but that he wasn't going down.

Appellant's first assignment of error is, therefore, overruled.

Appellant, in his second assignment of error, argues that he was deprived of his right to confrontation when the trial court limited

his right to cross-examine Kassler about a conversation she allegedly overheard between Stolpa and Bruce Campbell.

During trial, Kassler was asked whether or not she had witnessed any conversation between Stolpa and Bruce Campbell involving a gun. Both Stolpa and Campbell denied having any discussions about selling the gun. After she testified that she heard Stolpa talk about selling her gun after appellant was arrested, appellee objected on the basis of hearsay and the objection was sustained. The trial court ordered the jury to disregard such statement. Kassler was later asked whether she witnessed Stolpa and Campbell discussing the gun on January 2, 2011. After appellee objected on the basis of hearsay, the court sustained the objection.

Kassler then testified that, on January 2, 2011, and then about a week after that, she witnessed a conversation between Campbell and Stolpa about a gun. The conversation on January 2, 2011, occurred while she was at Campbell's house. She testified that after she heard the conversation, she "[a]bout had a stroke" and moved out of Stolpa's house. Transcript at 512.

Subsequently, the following discussion took place on the record:

"MR. DESMOND: Did I say that Kara Kassler would testify that she heard Tina Stolpa and Bruce Campbell talking about the sale of this gun? Did I say that?

"MS. STEFANCIN: I thought she testified to that.

"THE COURT: She started to.

"MR. DESMOND: Then you stopped her.

"THE COURT: Yeah.

"MS. STEFANCIN: We had a bunch of side bars up here yesterday. I'm trying to remember.

"MR. DESMOND: Let me try to clear it up. She would have testified, had she been allowed to, that she witnessed—

"THE COURT: It was a relevancy issue because it took—the conversation took place from what I understand substantially later.

"MS. STEFANCIN: Much later.

16

"THE COURT: After the incident.

"MS. STEFANCIN: She said it was after a week or so.

"THE COURT: After the 1st.

"MS. STEFANCIN: Yeah, she said she heard the conversation a week or so after and that's why you weren't allowed to get into the details.

"MR. DESMOND: Did I say that she heard them talking about the sale of this gun?

"THE COURT: Yes.

"MR. DESMOND: Okay. Then I don't have any proffer.

"THE COURT: Right." Transcript at 635–636.

Appellant now maintains that he was denied his right to confrontation when the trial court refused to permit him to question Kassler about the specific details of the conversation that she overheard. Appellant notes that both Campbell and Stolpa denied that they discussed selling the gun and argues that the issue of how and when Campbell came to possess the gun was germane to the case.

We note that such conversation allegedly occurred approximately a week after the incident in this case. There was no proffer as to what Kassler's testimony would have been had appellant been permitted to cross-examine Kassler in greater detail about the conversation. Furthermore, assuming, arguendo, that the trial court should have allowed Kassler to testify about the specific details of the conversation, we find such error harmless based on the overwhelming evidence of appellant's guilt.

Appellant's second assignment of error is, therefore, overruled.

*State v. Anderson*, 2012 WL 116172, at *7-10.

Petitioner asserts that he was denied the right to present a defense and to confront the witnesses against him because the trial court refused to permit him to cross-examine Stopla regarding her divorce and his plan to testify at her divorce hearing that she was lying about her

accusation that her husband committed domestic abuse against their daughter.  Such evidence, Petitioner asserts, would have established Stopla's bias and motive to lie in her testimony against him.  He contends that his conviction of having a weapon while under a disability rested "almost exclusively" on Stopla's testimony, *Traverse*, Doc. No. 13, PageID# 1055, and asserts that the state appellate court erred in concluding that any error was harmless.

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to physically confront and cross examine adverse witnesses at all stages of the trial. *Illinois v. Allen*, 397 U.S. 337, 388 (1970). A criminal defendant's right to cross-examine witnesses against him, however, is not unlimited. "Trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). The Confrontation Clause thus guarantees the opportunity for effective cross-examination, not cross-examination in whatever way or to whatever extent the defendant may desire. *Id*. (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)); *see also Norris v. Schotten*, 146 F.3d 314, 330 (6th Cir. 1998) (no Confrontation Clause violation where relevance of questions prohibited on cross-examination is unclear and the risk of prejudice real) (citations omitted).

Where a trial court limits the extent of a criminal defendant's cross-examination, but does not bar it completely, the trial court is afforded wider latitude.  *Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir. 1989). Under such circumstances, the test is "whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory."  *Drummond v. Houk*, 761 F.Supp.2d (N.D. Ohio 2010) (citing *Dorsey v. Parke*)).

A Confrontation Clause violation is subject to harmless error analysis. "[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht [v. Abrahamson,* 507 U.S. 619 (1993)]." *Fry v. Pliler*, 551 U.S. 112 2(007). "To resolve the harmless error issue, [the Court] must ask whether the constitutional violation 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Vasquez v. Jones*, 496 F.3d 564, 575 (6th Cir. 2007) (quoting *Brecht*, 507 U.S. at 623). This inquiry involves consideration of several factors including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall,* 475 U.S. at 684; *see also Earhart v. Konteh*, 589 F.3d 337, 345–46 (6th Cir. 2009) (applying the *Van Arsdall* factors under the *Brecht* standard). "If the constitutional error had no material effect, the verdict must stand. However, if the court has 'grave doubts' whether the error had a substantial or injurious effect or influence in determining the jury's verdict," the Court must grant the petitioner's writ. *Jensen v. Romanowski*, 590 F.3d 373, 379 (6th Cir. 2009) (citing *O'Neal v. McAninch* 513 U.S. 432, 435–36 (1995); *Stallings v. Bobby*, 464 F.3d 576, 582 (2006)).

The state appellate court noted that during a *voir dire* of Stopla outside of the presence of the jury, she denied knowing that Petitioner planned to testify at her divorce hearing. *See Return of Writ*, Doc. No. 10, PageID# 68. The trial transcript confirms this fact. Stopla stated that her daughter had filed domestic violence charges against her husband, but that Kassler did not see what had happened. *Trial Transcript*, PageID# 537. Stopla never told Kassler she had filed

domestic violence charges against her husband to get him out of the house.  *Id*.  She denied knowing that either Kassler or Petitioner planned to testify against her at her divorce hearing. PageID# 538.

In view of the foregoing, Petitioner cannot establish he was prejudiced by the trial court's ruling prohibiting him from cross-examining Stolpa regarding her divorce or her potential bias against Petitioner in view of his plan to testify against her in those proceedings.  Moreover, and contrary to Petitioner's allegation here, the record confirms that any error was harmless. Petitioner points to alleged inconsistencies in the witness' statements against him, *Traverse*, Doc. No. 13, PageID# 1057-58, in support of his argument that, contrary to the court of appeals' decision, overwhelming evidence did not exist against him.   Nonetheless, the trial transcript confirms that, in addition to Stolpa's testimony, the testimony of Campbell, Kassler, and Myers put Petitioner in possession of a gun.  Petitioner's phone conversation with Campbell while Petitioner was in jail provided further incriminating evidence against him. As noted by Respondent, defense counsel was able to otherwise to extensively cross-examine prosecution witnesses, and Kassler admitted that she had been upset and mad and had exaggerated in her written statement to police.  *Trial Transcript*, PageID# 721-22.  In view of this evidence, the extensive cross examination otherwise permitted by the trial court, and the general strength of the prosecution's case him, this Court cannot conclude that any alleged error had a substantial or injurious effect or influence in determining the jury's verdict.  Nor may this Court find that the state appellate court contravened or unreasonably applied federal law in rejecting Petitioner's claim, or that its decision constituted an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d)(1), (2).

In claim two, Petitioner asserts that he was convicted in violation of the Confrontation Clause because the trial court limited his cross-examination of Kara Kassler, his girlfriend, about the details of a conversation she heard after the date of Petitioner's arrest between Campbell and Stolpa involving a gun.  Kassler testified that after the date of Petitioner arrest, she witnessed a conversation between Stolpa and Campbell regarding a gun.  *Trial Transcript*, PageID#  736-37.  After she heard this conversation, she "[about had a stroke]" and moved out of Stolpa's house.  PageID# 737.  The record fails to reveal what the content of Kassler's testimony would have been.  Because the incident allegedly took place at least a week after the date of the incident at issue, it is difficult to ascertain how the conversation would have had more than marginal significance.

For these reasons, and for those previously discussed, the Court again concludes that any error was harmless and fails to provide a basis for federal habeas corpus relief.

**Claim Five**

In claim five, Petitioner asserts that he was denied a fair trial based on cumulative error.  This claim fails to provide him a basis for relief.  The United States Court of Appeals for the Sixth Circuit has held that claims of cumulative error are not cognizable in habeas corpus proceedings because the United States Supreme Court has not spoken on the issue.  *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006).  *See also Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006).  Thus, the Court finds that claim five does not present a habeas question for review.

**Recommended Disposition**

**WHEREUPON**, the Magistrate Judge **RECOMMENDS t**hat this action be **DISMISSED.**

**Procedure on Objections**

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

  *s/  Elizabeth  A.  Preston  Deavers*
Elizabeth A. Preston Deavers
United States Magistrate Judge